ELWOOD W. McGUIRE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CHARLES A. McGUIRE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 75537, 75538. Promulgated August 2, 1935.

*Robert A. Littleton, Esq.*, for the petitioners.
*Elden McFarland, Esq.*, and *C. R. Marshall, Esq.*, for the respondent.

OPINION.

SEAWELL: " The petitioners contend that the gain resulting to them from the sale by each of the 40 shares of stock to Dille and McGuire Manufacturing Company is the difference between the amount received and the cost basis, as provided by Section 113 of the Revenue Act of 1928; and the profit realized is taxable at the rate of 12½% (capital gain tax)."

The respondent insists that what the petitioners received as a result of the sale of said stock, redeemed and canceled, was " essentially equivalent to the distribution of a taxable dividend ", and that the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, should be treated as a taxable dividend. The correct determination of the issue thus presented depends upon whether or not the transactions involving the sales of stock to the company were in point of time and manner such as to make the distribution, redemption, and cancellation, in whole or in part, essentially equivalent to the distribution of a taxable dividend, within the meaning of section 115 (g) of the Revenue Act of 1928, which provides:

If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially

equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend. In the case of the cancellation or redemption of stock not issued as a stock dividend this subsection shall apply only if the cancellation or redemption is made after January 1, 1926.

The respondent's determination being against petitioners' contention and presumptively correct, the burden of proof, of course, is on the petitioners to show that the facts do not bring the transactions within the purview of the provisions of the section quoted. Cf. *Shelby H. Curlee, Trustee,* 28 B. T. A. 773; affd., 76 Fed. (2d) 472; *Leopold Adler,* 30 B. T. A. 897; *George Hyman,* 28 B. T. A. 1231; affd., 71 Fed. (2d) 342; certiorari denied, 293 U. S. 570.

The various sections of the Revenue Act of 1928 relied on by petitioners to sustain their insistence, for the sake of brevity, are not herein quoted, but merely cited. Briefly stated, petitioners contend that the result of the purchase of 40 shares from each of them was a distribution in partial liquidation in complete redemption and cancellation of part of the company's stock within the meaning of section 115 (c) and (h) of the Revenue Act of 1928 and that the amount of gain to them as distributees, resulting from the exchange of their stock for the securities which they received, should be determined under sections 111 and 112 of the Act of 1928 and upon the basis provided in section 113 (sec. 113 (a)(2) and (b)(2)), and that such profit may properly be reported as capital net gain (sec. 101), subject to the tax upon capital net gains (sec. 101 (a)), or, in the alternative, the transactions were in fact purchases by the corporation from them of its own stock and the amounts received were in payment of the purchase price thereof.

The purpose and principles underlying the sections of the Revenue Act of 1928 above mentioned and corresponding provisions of prior revenue acts and the interpretations placed thereon are set forth in numerous decided cases, some of which are *Pearl B. Brown, Executrix,* 26 B. T. A. 901; affd., 69 Fed. (2d) 602; certiorari denied, 293 U. S. 579; *James D. Robinson,* 27 B. T. A. 1018; affd., 69 Fed. (2d) 972; *Harry A. Koch,* 26 B. T. A. 1025; *Annie Watts Hill,* 27 B. T. A. 73; affd., 66 Fed. (2d) 45; *Henry B. Babson,* 27 B. T. A. 859; affd., 70 Fed. (2d) 304; certiorari denied, 293 U. S. 571; *James A. Connelly,* 30 B. T. A. 331; *Alfred E. Fuhlage,* 32 B. T. A. 222; *Girard Trust Co. et al., Administrators,* 32 B. T. A. 926; *Hyman* v. *Helvering, supra; Commissioner* v. *Cordingley,* 78 Fed. (2d) 118 (C. C. A., 1st Cir.); *Commissioner* v *Quackenbos,* 78 Fed. (2d) 156 (C. C. A., 2d Cir.); *David J. Champion,* 27 B. T. A. 1312; affd., 78 Fed. (2d) 513 (C. C. A., 6th Cir.).

From a consideration of the foregoing cases and others therein cited, it is evident that whether certain transactions fall within or without the provisions of section 115 (g), *supra*, must be determined upon their particular facts and circumstances. In the instant proceedings the record shows that when the company was incorporated it had an authorized capital of only $9,000, which was never increased but in 1930 was reduced to $5,000, the par value of the stock all the time being $50 per share.

During the taxable year involved and for some years prior thereto the petitioners owned all of the stock of the company except one share owned by the wife of one petitioner and mother of the other petitioner. The evidence shows that the authorized capital of $9,000 was never adequate for carrying on the business of the company and that the earnings or profits from the business were very largely utilized in operating and developing the business of the company, which, as shown by our findings of fact, was in its latter years very successful, very substantial dividends being declared and paid out of the large earnings or profits of the business, a portion of which earnings, however, for several years prior to 1930 were, according to the testimony of the company's president, conserved with a view to the establishment of a manufacturing plant in one of the New England States, though the record fails to show that any official resolution to effect such a purpose was ever taken by the stockholders or directors of the company. Such failure, however, in our opinion, in view of facts shown in the record, does not warrant the conclusion that the action of the company in conserving its earnings for several years as stated was availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being distributed as dividends. In other words, in the light of the record, we think the company did conserve its earnings with the intent and purpose on the part of the petitioners, practically sole owners of the company, to establish a manufacturing plant in the eastern states, and abandoned the idea only after the depression struck in 1929 and it appeared unwise and inadvisable to do so. Notwithstanding such fact, it does not, in our opinion, necessarily follow that, when fairly viewed, the transactions in question fail to make the distribution to the petitioners, as described, " essentially equivalent to the distribution of a taxable dividend " falling within and governed by the provisions of section 115 (g) of the Revenue Act of 1928, as contended by the petitioners.

It has been held, and we think properly, that the contention that payments made by a corporation in exchange for its stock are taxable as dividends, except when made in pursuance of a plan for

complete liquidation of the corporation, can not be sustained. See *Commissioner* v. *Brown, supra; Commissioner* v. *Babson, supra; Commissioner* v. *Cordingley, supra.*

The statute clearly contemplates that stock dividends may be issued and redeemed; it makes explicit provision as to the taxation of sums paid in such redemption; it recognizes that the capitalization of earnings by means of stock dividends is not a distribution of earnings and is not taxable. (Sec. 115 (f).) " The statute does not provide that every cash redemption of shares shall be treated *per se* as a dividend but only those which because of some circumstance of time and manner are in fact the essential equivalent of a dividend." *Commissioner* v. *Brown, supra.* See also *Hyman* v. *Helvering, supra.*

The record shows that the authorized capital stock of $9,000 was exceedingly small for the company, which was doing annually over a million dollar business. It further shows that a large surplus had been accumulated from earnings since February 28, 1913, partially, if not solely, conserved with a view to the establishment of a plant in an eastern state, but that in the latter part of 1929 the petitioners and the company abandoned such purpose and reached the conclusion that the large surplus should be distributed for petitioners' use. There is no evidence indicating there was ever any idea of ceasing operations, all the evidence indicating the purpose to carry on the business.

On January 11, 1930, a stockholders' meeting was held, at which the chairman called attention to the fact that the charter of the corporation would expire December 11, 1930, and it would be necessary to reorganize the corporation, and that, so anticipating, a thorough and complete audit of the books of the company had been made. At that meeting resolutions were adopted, set out or described in our findings of fact, providing for the purchase by the company of 40 shares of its capital stock from each of the petitioners at its book value, such shares to be held " as the property of and in the treasury of the Company until the capital stock of the Company can be reduced to one hundred shares of the par value of fifty dollars each and that the officers take such action as may be necessary to effect such purchase." At the same meeting the capital stock was reduced to $5,000, subject to the approval of the Secretary of the State of Indiana (which was promptly given) and immediately after the adjournment of the stockholders' meeting the directors, the petitioners herein, met and ordered that $12,000 per share be paid for 40 shares of the company's stock to be purchased from each of the petitioners. Thereafter, shares of stock were purchased from petitioners as contemplated and paid for and certain old certificates surrendered and canceled as set forth in the findings of fact, the

capital of the company being reduced, as stated, from $9,000 to $5,000, and the company was granted a charter for perpetual existence. The reduction in capital stock is not shown to have been necessary in order to obtain, under the Indiana General Corporation Act, a charter of perpetual existence. It was not necessary to reduce the capital in order to effect a distribution of the accumulated surplus.

The reduction in the capitalization of the company was not to bring the capitalization to a figure more nearly the approximate value of the assets or to create a surplus. The company did not contract its business. There was no shrinkage in the business comparable to the reduction in capital. (Cf. *T. Pierre Champion*, 27 B. T. A. 1312.) There was no impairment of the company's capital. No intention of winding up its affairs. The fact that the petitioners elected to report certain gain or profit from the transactions in question and be taxed thereon at capital gain rates is not determinative. Whether a corporation is in liquidation is a question of fact. (Cf. *Fred T. Wood*, 27 B. T. A. 162, 167, and cases therein cited.) If the earned surplus, accumulated after February 28, 1913, had been distributed direct to the stockholders of the company in the taxable year in issue, it would, undoubtedly, have been taxable as an ordinary dividend (see 115 (a), Revenue Act of 1928).

Did not what was done by the company, which was controlled and practically owned absolutely by the two petitioners, produce the same result as would have a distribution by the company direct to its stockholders of its surplus in an amount equal in value to what they received under the method pursued?

The distribution made to the stockholders, in our opinion and we so hold, was made at such time, under such circumstances, and in such manner as to make the transaction with respect to the 80 shares of the company's stock essentially equivalent to the distribution of a taxable dividend. In reaching such determination, it is not necessary that we should find or conclude that the original intent in conserving earnings of the company was not to establish another plant, or was a scheme or artifice to evade payment of the proper tax.

Whatever may have been the intent or purpose of the company in accumulating and conserving during several years the earned surplus shown to exist in a large amount in 1930, the time and manner of its disposition; the reduction of the company's already small capital of $9,000 to $5,000; and the purchase from the petitioners of 80 of its shares at $12,000 per share (par value being $50 per share), in connection with other facts and circumstances disclosed by the record, in our opinion, bring the case within the intent of section 115 (g), *supra*, whether or not there was originally any attempt or purpose

on the part of the company or the petitioners to evade the payment of any tax.

We have cited herein numerous decisions, some holding that the distributions and cancellations described were essentially equivalent to distributions of taxable dividends within the meaning of section 115 (g), *supra*, and others that they were distributions in complete or partial liquidation of corporations and were within the intent of section 115 (c) and (h), *supra*, each as heretofore indicated depending on its particular facts and circumstances.

We think this case is distinguishable from those falling under section 115 (c) and (h), *supra*, and properly falls under section 115 (g), *supra*, and should be dealt with accordingly, being controlled by the principles enunciated and applied in *Hyman* v. *Helvering*, *supra*, and in other cases cited herein.

What the Finance Committee of the Senate, having under consideration the Internal Revenue Bill of 1926, stated in its report with reference to section 201 (g) of the Revenue Act of 1926 throws light upon the intent and purpose of. Congress in reenacting identically the same section as 115 (g) in the Revenue Act of 1928. In that report it was stated as follows:

Section 201 (g): It has been contended that under existing law a corporation, especially one which has only a few stockholders, might, without resorting to the device of a stock dividend, be able to make a distribution to its stockholders which would have the same effect as a taxable dividend. For example: Assume that two men hold practically all the stock in a corporation, for which each had paid $50,000 in cash, and the corporation had accumulated a surplus of $50,000 above its cash capital. It is claimed that under existing law the corporation could buy from the stockholders, for cash, one-half of the stock held by them and cancel it without making the stockholders subject to any tax. Yet this action, in all essentials, would be the equivalent of a distribution through cash dividends of the earned surplus. The subdivision as rewritten by the House bill is intended to make clear that such a transaction is taxable and the committee approves the provision, which obviously does not apply in cases of complete liquidation of all the stocks of the corporation.

We think it immaterial that the stockholder owning only one share could not participate in the distribution or dividend. *Northern Trust Co., Trustee*, 20 B. T. A. 866; affd., 54 Fed. (2d) 289; certiorari denied, 285 U. S. 558, and cases therein cited; *Joseph Goodnow & Co.*, 5 B. T. A. 1154; *F. G. Lamb*, 14 B. T. A. 814. The basis of redemption was uniform to those participating. (Cf. *James D. Robinson* v. *Commissioner*, *supra*.) See *Leopold Adler*, *supra; Shelby H. Curlee*, *supra*.

In our opinion, and we so hold, the payments made in 1930 in securities owned by the company, to the petitioners represent, in the circumstances of the instant case, taxable income whether con-

sidered distributed as a dividend or as a consideration for the acquisition of the 80 shares of stock. Cf. *Peabody* v. *Eisner*, 247 U. S. 347; *United States* v. *Phellis*, 257 U. S. 156; *Rockefeller* v. *United States*, 257 U. S. 176; *United States* v. *Fuller*, 42 Fed. (2d) 471; *Security First National Bank of Los Angeles, Executor*, 28 B. T. A. 289, 311; *George F. Baker, Jr., Executor*, 28 B. T. A. 704.

We are further of the opinion and hold that the securities received by Elwood W. McGuire were properly valued by the respondent at their fair market value at the time of receipt rather than at par or face value as reported by Elwood W. McGuire on his tax return. *Arthur Curtiss James*, 13 B. T. A. 764; affd., 49 Fed. (2d) 707; *United States* v. *Fuller*, *supra;* art. 627, Regulations 74.

We are further of the opinion and hold that the respondent did not err when, in determining the fair market value of Liberty bonds received by Elwood W. McGuire in 1930 from the company in the amount of $490,316.67, he added the accrued interest to date the bonds were received, or $5,666.67, and reduced the interest, $26,674, reported by McGuire, by the amount of accrued interest and determined the taxable interest on Liberty bonds to be $21,007.33.

We are, therefore, of the opinion and hold that the respondent's determination in each of the cases herein is correct and is accordingly approved.

Reviewed by the Board.

> *Decision in each docket will be entered for respondent.*

MATTHEWS dissents. 